
**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

UNITED STATES OF AMERICA,

v.                                    Criminal No. 3:18-cr-97

TRINIDAD DIAZ-MARTINEZ,

      Defendant.

## MEMORANDUM OPINION

This matter is before the Court on the Defendant's MOTION TO DISMISS INDICTMENT (the "Motion") (ECF No. 18). For the reasons set forth below, the Motion will be denied.

### BACKGROUND

**I.    Procedural Context**

Trinidad Diaz-Martinez ("Diaz-Martinez") was charged in a one-count indictment with illegal reentry pursuant to 8 U.S.C. § 1326(a). ECF No. 3. On October 24, 2018, Diaz-Martinez filed his Motion (ECF No. 18). The parties briefed the Motion, and, on November 27, 2018, the Court received evidence and heard oral argument on it. See Nov. 27 Hr'g Tr. (hereinafter "Hr'g Tr.") (ECF No. 30).

At the conclusion of the November 27 hearing, the Court ordered supplemental briefing on several issues that arose at the hearing. Hr'g Tr. at 125-129; ORDER (ECF No. 29).[1] Then, after

---

[1]    Due to several (party-requested) extensions to the

reviewing the supplemental briefing, and upon further consideration of the Motion, the Court ordered a second round of supplemental briefing on additional, specific questions pertaining to the Motion (ECF No. 41). The matter was fully submitted to the Court on April 1, 2019, and is now ripe for decision.

## II. Factual Background

Defendant Trinidad Diaz-Martinez was born in and is a citizen of El Salvador. ECF No. 18 at 1. At some point in or around August 1996 (when he was 16-years-old), Diaz-Martinez entered the United States illegally. ECF No. 19 at 1. He encountered U.S. Border Patrol on or around August 17, 1996 and was assigned an alien file number ending in "669." Id.; Hr'g Tr. at 55 (ECF No. 30).

At the November 27 evidentiary hearing, Diaz-Martinez's uncle, Santos Lemus ("Lemus") testified that, following Diaz-Martinez's encounter with immigration officials in August 1996, he (Lemus) received a phone call informing him of his nephew's situation.[2] Hr'g Tr. at 9, 36. Lemus then requested that immigration officials allow Diaz-Martinez to stay with him. Id.

---

supplemental briefing schedule, the first round of supplemental briefing was fully submitted to the Court on February 6, 2019.

[2]    Lemus testified that Diaz-Martinez is his nephew by marriage; Lemus' wife is Diaz-Martinez's aunt. Hr'g Tr. at 7.

Immigration officials allowed this arrangement and mailed documents to Lemus for him to fill out so that Lemus could become the responsible party for Diaz-Martinez. Id. at 13, 27, 37; Def. Ex. C. These documents were mailed to and received by Lemus at Lemus' apartment: 1001 Heritage Park, Apartment T2 in Fredericksburg, Virginia ("Heritage Park").[3] Hr'g Tr. at 9, 13, 27-28, 37. Among other things, the paperwork that Lemus received from immigration officials required Lemus to take Diaz-Martinez to all immigration court proceedings. Id. at 28. Lemus signed this paperwork. Id.

On August 27, 1996, Diaz-Martinez was personally served (care of Lemus) a "Show Cause Order," which explained in Spanish that immigration officials believed that Diaz-Martinez was an alien who was not lawfully admitted, and that he was to have a hearing before an immigration judge where he would receive information about any relief from deportation for which he might be eligible. ECF No. 19 at 1-2; Gov't Ex. 1. Further, this Show Cause Order informed Diaz-Martinez that if he were ordered removed, he would have certain administrative remedies.[4] ECF No. 19 at 2; Gov't Ex.

---

[3]    Although Lemus' testimony on this point is not entirely clear, it appears that Lemus lived at the Heritage Park address from about 1994 to 2006. See Hr'g Tr. at 9-10.

[4]    The Show Cause Order was cancelled on June 18, 1997 (the same day that the Notice to Appear, discussed infra, was dated). Def. Ex. B; Hr'g Tr. 107-09. The parties agree that, due to a change

1.

On September 5, 1996, Diaz-Martinez received an "Order of Release on Recognizance" and was released to the custody of his uncle, Lemus.[5] ECF No. 18 at 2; ECF No. 19 at 2; Gov't Ex. 2. The form was in English, but Diaz-Martinez signed the portion of the form indicating that it had been explained to him in Spanish. Gov't Ex. 2. Neither the Show Cause Order nor the Order of Release on Recognizance informed Diaz-Martinez of when his immigration hearing would be held. ECF No. 18 at 2. After this paperwork was sorted out, Diaz-Martinez went to live with Lemus at the Heritage Park apartment. Hr'g Tr. at 8-10, 29.

On June 18, 1997, a "Notice to Appear" ("NTA") was allegedly mailed by immigration officials to Diaz-Martinez at the Heritage Park address. ECF No. 18 at 2; Hr'g Tr. at 62; Gov't Ex. 3. The NTA was sent by regular mail. Id. The NTA did not set a date and time for Diaz-Martinez's immigration hearing; rather, it stated that the hearing would be at a date and time "to be set." ECF No. 18 at 2; ECF No. 19 at 2; Hr'g Tr. at 64; Gov't Ex. 3. Then, on

---

in immigration law, this Show Cause Order does not have any bearing on the Court's analysis regarding the jurisdiction of the immigration court. ECF No. 34 at 1-2; ECF No. 37 at 12. However, the Court does not view the fact that the Show Cause Order was cancelled as precluding it from considering that the Show Cause Order put Diaz-Martinez on notice of certain information.

[5] Among other conditions, this Order instructed that Diaz-Martinez was not to change his address without alerting immigration officials. ECF No. 19 at 2; Gov't Ex. 2.

July 11, 1997, the immigration court allegedly mailed a "Notice of Hearing" ("NOH") to Diaz-Martinez at the Heritage Park address stating that his immigration hearing would be held on August 13, 1997 at 1:30 p.m. at a specific address in Arlington, Virginia. ECF No. 18 at 2-3; ECF No. 19 at 3; Hr'g Tr. at 67; Gov't Ex. 4.

Diaz-Martinez argues that the record contains no evidence that he ever received the NTA, the NOH, or the Order of the Immigration Judge (the document informing him that he had been removed). ECF No. 18 at 2-3; Gov't Ex. 5. Diaz-Martinez did not testify to this himself, and his evidence on the lack of receipt of these documents comes only from Lemus' testimony.

Lemus testified that he and Diaz-Martinez lived at the Heritage Park address for all of 1997 and that he (Lemus) never received any mail at that address (addressed either to Diaz-Martinez or addressed to Lemus) informing Diaz-Martinez of his immigration court proceedings. Hr'g Tr. at 28-29, 33, 42, 44-45. Lemus further testified that he was the only person who had a key to his mailbox, id. at 30-31, and that Diaz-Martinez never checked the mail for him. Id. at 40. And, he testified that, on several occasions, the mail carrier put mail in the wrong mailbox, causing Lemus to miss paperwork from his car insurer on about five occasions, Christmas cards from his employer on about seven

occasions, and his legal permanent residence card.[6] Id. at 30-33. Had he received notice from immigration officials to take Diaz-Martinez to immigration court, Lemus stated that he would have done so. Id. at 33. That is so because he had signed a document in which he agreed that he would take Diaz-Martinez to all immigration court proceedings. Id. at 27-28.

As prescribed on the NOH, an immigration hearing for Diaz-Martinez was held on August 13, 1997, but neither Diaz-Martinez nor Lemus appeared. ECF No. 18 at 3; Hr'g Tr. at 69. Diaz-Martinez was ordered removed in absentia to El Salvador. ECF No. 19 at 3; Hr'g Tr. at 69; Gov't Ex. 5. In the Order of Removal, the immigration judge wrote "Only relief is motion to reopen." Id. A certificate of service attached to the Order of Removal indicates that it was mailed (via regular mail) to Diaz-Martinez "c/o Custodial Officer" on August 13, 1997. Hr'g Tr. at 69; Gov't Ex. 5.[7] The record also contains a cover letter (ECF No. 34-2 at 4) dated August 14, 1997, addressed to Diaz-Martinez at the Heritage Park address, that states that the immigration court's order is attached. Diaz-Martinez asserts that he did not receive this

---

[6]     The mailboxes for the entire apartment complex (about 100 in all) were located at the entrance of the complex; the mail carrier would open all of the boxes before distributing mail to the mailbox of the individual apartments. Hr'g Tr. at 29-30.

[7]     Lemus was considered Diaz-Martinez's custodial officer. Hr'g Tr. at 121.

document either.

Then, on October 31, 1997, immigration officials mailed (by certified mail) to Diaz-Martinez at Heritage Park a Form I-166 informing him that: (1) he had been found deportable; (2) there was no relief available to him;[8] (3) his deportation would be enforced; and (4) he was to turn himself in on December 4, 1997 for deportation. ECF No. 18 at 4; ECF No. 19 at 3; Hr'g Tr. at 71-73; Gov't Ex. 6. That same certified mailing also contained a Form I-294, informing Diaz-Martinez that he was inadmissible for a period of five years after his removal. Id. Diaz-Martinez signed for the receipt of these documents.[9] ECF No. 18 at 4; ECF No. 19 at 3; Gov't Ex. 6. Because Diaz-Martinez signed for the certified mail, it could not have been delivered to Lemus' mailbox like the other notices would have been. ECF No. 38 at 2 n.1.

The December 4, 1997 date for Diaz-Martinez to turn himself in came and went. ECF No 19 at 4; Hr'g Tr. at 73. A warrant was issued for his arrest. Id. At some point in 1999 (perhaps

---

[8]    Specifically, the I-166 stated: "As you know, following a hearing in your case you were found deportable and the hearing officer has entered an order of deportation. A review of your file indicates there is no administrative relief which may be extended to you. . . ." Gov't Ex. 6 (emphasis added). The underscored information was not correct. See supra note 19.

[9]    When specifically asked if he was aware that Diaz-Martinez had received certified mail at the Heritage Park address informing him that he had been ordered deported, Lemus testified that he was unaware that such mail had been received. Hr'g Tr. at 46.

February), Lemus testified that Diaz-Martinez left the Heritage Park address. Hr'g Tr. at 29, 35, 43-44. Lemus did not know where Diaz-Martinez went after leaving the Heritage Park address in 1999. Id. at 44, 47. Even though Lemus considered that he was still responsible for Diaz-Martinez, Lemus testified that he did not inform immigration officials that Diaz-Martinez had left the Heritage Park address. Id. at 47-48.

Diaz-Martinez did not encounter law enforcement again until July 12, 1999, when he was arrested by the Stafford County Sheriff's Department and turned over to immigration officials on his 1997 Removal Order. ECF No. 19 at 4; Hr'g Tr. at 74; Gov't Ex. 7. He was released that same day on an Order of Supervision, which required him to follow certain conditions, including checking in with immigration officials each month. ECF No 19 at 4; Hr'g Tr. at 74-77; Gov't Ex. 8. Diaz-Martinez followed this check-in requirement for a few months. Hr'g Tr. at 77-79; Gov't Ex. 9. During the October 1999 check-in, Diaz-Martinez was informed that he would be deported on November 1, 1999 (pursuant to the 1997 Removal Order). Hr'g Tr. at 78. Diaz-Martinez did not show up to be removed on November 1, 1999, and again, an active warrant for his removal was issued. Id. 78-79.

In April 2001, Diaz-Martinez applied for Temporary Protected Status ("TPS") and for Employment Authorization. ECF No. 18 at 4;

ECF No. 19 at 5; Gov't Exs. 10-11. On his initial application, he provided a different address than had been provided in previous immigration proceedings and falsely stated (under penalty of perjury) that he had not previously been involved in immigration proceedings. ECF No. 19 at 5; Hr'g Tr. at 83-84; Gov't Exs. 10-11. Further, the applications indicated that Diaz-Martinez received assistance in filing his applications from Gerardo Aguilar. Hr'g Tr. at 81; Gov't Exs. 10-11. Both the TPS and Employment Authorization applications were granted. ECF No. 19 at 5. And, because Diaz-Martinez falsely stated that he had not previously been involved with immigration officials, he was issued a new alien number ending in "85." Id.; Hr'g Tr. at 84.

Subsequently, using his new alien number, Diaz-Martinez applied for renewal of either his TPS or his Employment Authorization (or both) on several occasions between 2003 and 2010. Hr'g Tr. at 92-105; Gov't Exs. 13-16, 22-23, 25-29. In 2005, Diaz-Martinez was informed that his TPS was being withdrawn because he had several criminal convictions. Hr'g Tr. at 97-98; Gov't Exs. 17-19. His TPS was ultimately terminated in 2006 and his appeal of this decision was denied. Hr'g Tr. at 97-101; Gov't Exs. 17-21.

In December 2011, Diaz-Martinez was arrested on his outstanding 1997 Removal Order and was removed from the United

States on January 17, 2012. ECF No. 19 at 7; Hr'g Tr. at 106; Gov't Ex. 30. Thereafter, Diaz-Martinez reentered the United States without authorization. ECF No. 18 at 4; ECF No. 19 at 8. In February 2018, he was arrested for several state offenses. ECF No. 19 at 8. He was convicted of these offenses and turned over to immigration officials. Id. Following this, he was indicted by the grand jury for the illegal reentry charge he now faces. Id. He was arrested on this charge on August 9, 2018. ECF No. 7.

## DISCUSSION

### I. Framework for Collateral Challenges to Prior Deportation Orders

Diaz-Martinez has been charged with illegal reentry under 8 U.S.C. § 1326(a). To prove that charge, one of the elements that the Government will have to establish is that Diaz-Martinez "has been denied admission, excluded, deported, or removed" and thereafter reentered the United States without, inter alia, the permission of the United States Attorney General. 8 U.S.C. § 1326(a). In United States v. Mendoza-Lopez, 481 U.S. 828 (1987), the Supreme Court of the United States held that, in illegal reentry cases, an alien has a due process right to challenge the underlying deportation order. Thereafter, Congress codified the due process requirements in 8 U.S.C. § 1326(d). See United States v. Moreno-Tapia, 848 F.3d 162, 165-66, 169 (4th Cir. 2017). At bottom, Section 1326(d) "is concerned with failures of due process

10

in an immigration proceeding that would make it fundamentally unfair to rely on a removal order coming out of that proceeding." Id. at 169. The statute focuses the inquiry on whether there were "procedural defect[s] in an immigration proceeding [that] insulate[] the resulting order from judicial review. . . ." Id.

Section 1326(d) sets out three elements that an alien must prove to challenge the underlying deportation order. In full, that subsection reads:

> In a criminal proceeding under this section [8 U.S.C. § 1326], an alien may not challenge the validity of the deportation order described in subsection (a)(1) or subsection (b) unless the alien demonstrates that—
>
>> (1) the alien exhausted any administrative remedies that may have been available to seek relief against the order;
>>
>> (2) the deportation proceedings at which the order was issued improperly deprived the alien of the opportunity for judicial review; and
>>
>> (3) the entry of the order was fundamentally unfair.

8 U.S.C. § 1326(d) (emphasis added). To satisfy Section 1326(d)(3), the Fourth Circuit has held that an alien "must show that (1) his due process rights were violated by defects in his underlying deportation proceeding, and (2) he suffered prejudice as a result of the defects." United States v. El Shami, 434 F.3d 659, 664 (4th Cir. 2005) (quoting United States v. Wilson, 316

11

F.3d 506, 510 (4th Cir. 2003)). To show prejudice, the alien must show that, "but for the errors complained of, there was a reasonable probability that he would not have been deported." Id. at 665. An alien may be excused from meeting certain Section 1326(d) requirements if the underlying deportation proceeding was procedurally flawed. See Moreno-Tapia, 848 F.3d at 169; United States v. Lopez-Collazo, 824 F.3d 453, 459-62 (4th Cir. 2016) (due process violation where alien was served the I-851 form in language he did not understand); El Shami, 434 F.3d at 662-64 (excusal from Sections 1326(d)(1) and (d)(2) and due process violation where alien did not receive notice of his immigration proceeding).

It is evident from the statutory text that the defendant must satisfy (or be excused from) all three elements of Section 1326(d) to succeed in a collateral challenge. And, this Court has so held. United States v. Gonzalez-Ferretiz, No. 3:18-cr-117, 2019 WL 943388, *3-4 (E.D. Va. Feb. 26, 2019) (surveying Fourth Circuit and district court decisions and holding "that an alien may only challenge his underlying deportation order by satisfying the three requirements of Section 1326(d)"); see also Moreno-Tapia, 848 F.3d at 166; El Shami, 434 F.3d at 663; United States v. Gomez-Salinas, No.2:19cr10, 2019 WL 1141063, *2-4 (E.D. Va. Mar. 12, 2019) (Davis, C.J.) ("[A] defendant must satisfy all three provisions

12

[of Section 1326(d)] before he may wage a collateral attack on the prior removal order."); United States v. Romero-Caceres, No. 1:18-cr-354, 2018 WL 6059381, at *3 (E.D. Va. Nov. 19, 2018) ("[D]efendant here may not challenge the June 2007 Removal Order unless he meets all three § 1326(d) requirements."). The Court's analysis in Gonzalez-Ferretiz applies in full force here.[10]

As the Court has previously noted, the burden of proof to establish that the elements of Section 1326(d) have been satisfied "rests with the defendant." United States v. Galcia, No. 1:15cr59, 2016 WL 4054926, *2 (E.D. Va. July 26, 2016). And, that burden must be met by "a preponderance of the evidence." Id. (citing several cases). If the alien meets his burden, "the illegal

---

[10]    As the Court discussed in Gonzalez-Ferretiz, language in Moreno-Tapia and a recent opinion by Judge Brinkema suggest that collateral challenges outside of Section 1326(d) might be possible. See Moreno-Tapia, 848 F.3d at 170 ("We need not decide today. . .whether due process might in some circumstances demand that an immigration order based on an unconstitutional conviction be subject to collateral attack."); United States v. Rivera Lopez, 355 F. Supp. 3d 428, 435 (E.D. Va. 2018) (it "remains an open question" whether "due process requires that a defendant be given an opportunity to bring a collateral attack beyond the requirements and limitations of § 1326(d)") (emphasis in original).

The Court continues to be of the view that, at this juncture, given the clear language of the statute and the fact that Moreno-Tapia, Lopez-Collazo, and El Shami all perform the collateral attack analysis solely within the Section 1326(d) framework, the cogent, well-reasoned approach taken in Romero-Caceres correctly sets out the proper framework for resolving challenges such as the one made here by Diaz-Martinez.

reentry charge must be dismissed as a matter of law." El Shami, 434 F.3d at 663 (citing Wilson).

In sum, allowing collateral challenges in Section 1326 prosecutions outside of Section 1326(d) flies in the face of the clear statutory text and Congress' intent.[11] Accordingly, if the Court determines that Diaz-Martinez has failed to satisfy any of the three elements of Section 1326(d), his collateral challenge must be rejected, and his motion denied. Conversely, however, if Diaz-Martinez satisfies (or is excused from) the three elements of Section 1326(d), the illegal reentry indictment must be dismissed. See El Shami, 434 F.3d at 663.

## II. Analysis

Diaz-Martinez's Motion rests on two arguments. First, he argues that he satisfies (or is excused from) the requirements of 8 U.S.C. § 1326(d), largely because he says he never received notice of his 1997 immigration hearing. Second, he argues that, because of defects in the NTA in 1997, the immigration court

---

[11]   The "Section-by-Section" analysis of the legislation that added Section 1326(d) states that the new subsection "allow[s] a court in a criminal proceeding against a deported alien who re-enters the U.S. to re-examine the underlying deportation order only if the alien" satisfies the three requirements of Section 1326(d). 140 Cong. Rec. S.5558-01 (daily ed. May 11, 1994), 1994 WL 181390, at *S5571 (emphasis added). "This language taken from United States v. Mendoza-Lopez, 481 U.S. 828 (1987), is intended to ensure that minimum due process was followed in the original deportation proceeding while preventing wholesale, time consuming attacks on underlying deportation orders." Id.

lacked jurisdiction to enter his removal order.

The Court will address each of these arguments in turn. And, for the reasons set out below, will deny the Motion.

### A. Section 1326(d)

Diaz-Martinez argues that he can succeed on a collateral attack under Section 1326(d) because he did not have notice of his 1997 removal proceedings, which, he argues: (1) excuses him from satisfying Section 1326(d)(1) and (d)(2); and (2) establishes a due process violation and prejudice, thereby satisfying Section 1326(d)(3). Alternatively, he argues that he is excused from Section 1326(d)(1) and (d)(2) because he was affirmatively misadvised of the remedies available to him. See ECF No. 44 at 20 (summarizing Diaz-Martinez's position). The Government has consistently argued that Diaz-Martinez has not satisfied his burden to satisfy the three requirements of Section 1326(d). See generally ECF No. 47.

After a careful review of the evidence in this case, the Court finds that Diaz-Martinez has proffered sufficient evidence to show that he did not receive notice of his 1997 immigration hearing. This, under El Shami, 434 F.3d at 663-65, excuses him from satisfying the administrative exhaustion and judicial review prongs of Section 1326(d)(1) and (d)(2), and establishes a due process violation. However, on the evidence in the record, Diaz-

15

Martinez has failed to satisfy his burden to demonstrate that he suffered prejudice. Thus, he cannot satisfy Section 1326(d)(3), and his collateral attack must fail.

### (1) Diaz Martinez Has Established That He Did Not Receive Notice Of His 1997 Removal Hearing

It is uncontroverted that an alien must be provided written notice of his or her removal proceedings. See, e.g., 8 U.S.C. § 1229(a)(1); El Shami, 434 F.3d at 663-65. Since 1996, the removal statute has required that such notice be given "in person to the alien (or, if personal service is not practicable, through service by mail to the alien or to the alien's counsel of record, if any)." 8 U.S.C. § 1229(a)(1); Nibagwire v. Gonzales, 450 F.3d 153, 156 (4th Cir. 2006) (explaining that regular mail service has been permitted since 1996). Service by regular mail "shall be sufficient if there is proof of attempted delivery to the last address provided by the alien. . . ." Id. § 1229(c). There is nothing in the record to show that immigration officials made an effort to personally serve the NTA or NOH on Diaz-Martinez or Lemus.[12] Instead, service was provided through regular mail. See Gov't Ex. 3, 4, 5. The Government has put forward no evidence that

---

[12] The Show Cause Order was personally served on Diaz-Martinez, but as discussed above, the Show Cause Order did not inform Diaz-Martinez of the date and time of his immigration hearing and was cancelled on the same day that the NTA was issued to Diaz-Martinez.

personal service was not practicable.[13]

To resolve this Motion, it is necessary to first review presumptions applicable to mail delivery. Then, the Court will apply this presumption to the evidence in the case.

### (a) Presumptions Applicable To Mail

Before dealing with service by mail in the immigration context, and in order for the Court to properly analyze the evidence before it, it is appropriate to discuss the general presumption that applies to mail delivery (sometimes referred to as the "mailbox rule"). As the Eleventh Circuit has succinctly put it:

> The common law has long recognized a rebuttable presumption that an item properly mailed was received by the addressee. Nunley v. City of Los Angeles, 52 F.3d 792, 796 (9th Cir.1995). The "presumption of receipt" arises upon proof that the item was properly addressed, had sufficient postage, and was deposited in the mail. The presumption is, of course, rebuttable.

Konst v. Fla. E. Coast Ry. Co., 71 F.3d 850, 851-52 (11th Cir. 1996) (footnote omitted). The Supreme Court of the United States has recognized the presumption: if a letter "properly directed

---

[13] The parties provided supplemental briefing on the import of the Government's failure to make such a showing, but there appears to be little authority on that topic or what it takes for personal service to be "not practicable." See ECF No. 44 at 1-2; ECF No. 47 at 3-5. The Government asserts that "most cases appear to treat service by mail as an acceptable means under the statute. . . ." ECF No. 47 at 4.

is proved to have been either put into the post-office or delivered to the postman, it is presumed ... that it reached its destination at the regular time, and was received by the person to whom it was addressed." Rosenthal v. Walker, 111 U.S. 185, 193 (1884). This is "not a conclusive presumption of law, but a mere inference of fact, founded on the probability that the officers of the government will do their duty and the usual course of business." Id. at 193-94 (citations omitted). The Court went on to explain that, when the presumption "is opposed by evidence that the letters never were received, [it] must be weighed with all the other circumstances of the case, by the jury in determining whether the letters were actually received or not." Id.; see also FDIC v. Schaffer, 731 F.2d 1134, 1137 n.6 (4th Cir. 1984) (citation omitted) ("A letter properly addressed, stamped and mailed is presumed to have been duly delivered to the addressee. . . .The presumption is especially strong when the delivery is by certified mail."); Lupyan v. Corinthian Colleges Inc., 761 F.3d 314, 319-323 (3d Cir. 2014); 2 McCormick on Evidence § 343 (7th ed., 2016 update); 2 Jones on Evidence § 10:3 (7th ed., 2019 update).

The Third Circuit's Lupyan case provides a good overview of the common law mailbox rule, including what it takes to raise the presumption and, in the context of regular mail, the types of evidence that are sufficient to overcome it. See 761 F.3d at 319-

323. The Court noted that there is "[a] 'weaker presumption' [of receipt]. . .where delivery is sent via regular mail, for which no receipt, or other proof of delivery, is generated." Id. at 319 (quoting Santana Gonzalez v. Att'y Gen., 506 F.3d 274, 279 (3d Cir. 2007)). To raise the presumption that the addressee received a particular mailing (sent by regular mail), circumstantial evidence, such as "evidence of business practices or office customs pertaining to mail" is appropriate. Id. But, a party giving a sworn statement about mail practices must "have personal knowledge of the procedures in place at the time of the mailing." Id. at 320 (internal quotation omitted).

Once there is sufficient evidence that the mailing took place, "the presumption of receipt imposes the burden of production on the party against whom it is directed[.]" Id. (alteration in original and internal quotation omitted). The party against whom the presumption operates must put forth evidence to rebut the presumption, thereby "destroy[ing] that presumption, leaving only that evidence and its inferences to be judged against the competing evidence and its inferences to determine the ultimate question at issue." Id. (citation omitted). In the civil case at issue in Lupyan, the Court held that "a single, non-conclusory affidavit or witness's testimony, when based on personal knowledge and directed at a material issue," even if

19

"selfserving," was sufficient to create a material fact at the summary judgment stage in a civil case. Id. at 320-23 (citations omitted). To hold otherwise—in other words, to "requir[e] more than a sworn statement to dispute receipt"—would "elevate[] the weak presumption intended by the mail box rule to a conclusive presumption that would be equivalent to an ironclad rule." Id. at 322.

Other courts, including the Fourth Circuit, have hewed to a similar framework to that outlined in Lupyan. For example, the Fourth Circuit held that testimony by a bank president who "saw to it the notices were put in an envelope and addressed to [the intended recipient] and put in the bank's mail, which in the ordinary course was daily posted" was "sufficient to create a presumption that the notices were duly mailed, and in the ordinary course reached the addressee, though of course it is for the jury to say, in view of her denial, whether this is true or not." Citizens' Bank & Tr. Co. of Middlesboro, Ky. v. Allen, 43 F.2d 549, 552 (4th Cir. 1930); see also Gen. Elec. Co. v. Brown Transp. Corp., 597 F. Supp. 1258, 1261 (E.D. Va. 1984) ("It is commonly recognized that evidence of a common business practice is sufficient to establish that a letter was mailed."); Laborer's Int'l Union of N. America, Local 578 v. N.L.R.B., 594 F.3d 732, 740 (10th Cir. 2010) (Gorsuch, J.) ("[A]n opposing party's sworn

denial of receipt can 'create[] a credibility issue that must be resolved by the trier of fact.'") (citation omitted) (alterations in original).

In sum, where a letter is sent by regular mail and there is evidence (typically through a sworn statement by one with personal knowledge of the mailing or mail procedures) that the letter was mailed, there is a presumption in federal court that the addressee received it. Once the presumption is raised, the recipient must put forward evidence of non-receipt. With regular mail, the recipient can put forward, for example, a sworn statement of non-receipt. See Lupyan, 761 F.3d at 320-22. Then, the issue of receipt becomes one for the trier of fact.

In the immigration context, the mail presumption has come up in the context of "motions to reopen" in absentia removal orders.[14] In evaluating a motion to reopen where service was by regular mail, the Fourth Circuit first noted that, when immigration officials serve "an alien with notice of a removal hearing by

---

[14] When an alien is removed in absentia pursuant to 8 U.S.C. § 1229a(b)(5) (like Diaz-Martinez), he may seek rescission of the removal order by, inter alia, filing a motion to reopen "at any time if the alien demonstrates that the alien did not receive notice in accordance with paragraph (1) or (2) of section 1229(a) of this title." 8 U.S.C. § 1229a(b)(5)(C)(ii) (emphasis added). Thus, the focus in a motion to reopen is on whether the alien received notice. See Santana Gonzalez, 506 F.3d at 277; Lopes v. Gonzales, 468 F.3d 81, 83 (2d Cir. 2006); Joshi v. Ashcroft, 389 F.3d 732, 736 (7th Cir. 2004).

regular mail, as allowed by current law, the agency is entitled to a presumption of effective delivery." Nibagwire, 450 F.3d at 154. This, of course, comports with the general presumption outlined above. The presumption applicable to regular mail is not as strong as the presumption of delivery of certified mail, but nonetheless exists.[15] See id. at 156-58; Santana Gonzalez, 506 F.3d at 278 (citing cases from the Second, Fourth [Nibagwire], Seventh, Eighth, and Ninth Circuits that have come to the same conclusion). As the Fourth Circuit concluded in Nibagwire,

> Accordingly, in Nibagwire's case where the notice was sent by regular mail, the BIA abused its discretion by applying both the delivery presumption for certified mail and Grijalva's evidentiary standard for rebutting the presumption. Maknojiya v. Gonzales, 432 F.3d 588, 589 (5th Cir. 2005) (per curiam); Ghounem, 378 F.3d at 744-45; Salta, 314 F.3d at 1079. On remand the regular mail delivery presumption and the parallel evidentiary standard for rebutting the presumption must be used in evaluating the evidence on the receipt of notice issue.

450 F.3d at 157. However, in Nibagwire, the Fourth Circuit did not determine the evidence necessary to "(1) rebut the presumption that regular mail is delivered and (2) prove that [Nibagwire] did

---

[15]    Before a change in the law in 1996, removal notices (like the ones at issue in this case) had to be served in person or by certified mail. See El Shami, 434 F.3d at 663-64; Nibagwire, 450 F.3d at 156-57. A "strong presumption of delivery is justified for certified mail because of the extra assurances of effective delivery provided by the U.S. Postal Service." Nibagwire, 450 F.3d at 156.

not receive the notice to appear," but it did note that Nibagwire had filed an asylum application, had showed up for an asylum interview, and supplied a number of relevant facts in an affidavit. Id. The Court remanded to the BIA for further consideration. Id. at 158.

Other courts have held that, with service by regular mail, a sworn affidavit by the alien can be sufficient to rebut the presumption of delivery and receipt and entitle the alien to an evidentiary hearing, at least where the alien "initiates a proceeding to obtain a benefit, appears at an earlier hearing, and has no motive to avoid the hearing." Salta v. I.N.S., 314 F.3d 1076, 1079-80 (9th Cir. 2002); Ghounem v. Ashcroft, 378 F.3d 740, 743-45 (8th Cir. 2004); Santana Gonzalez, 506 F.3d at 280. The Ninth Circuit has clarified post-Salta "that an affidavit is one way to establish non-receipt of a notice sent by regular mail. . . .But a sworn affidavit is not always necessary." Sembiring v. Gonzales, 499 F.3d 981, 989 (9th Cir. 2007). Rather, the test "is practical and commonsensical rather than rigidly formulaic." Id. at 988. The BIA has endorsed a flexible approach to determining whether the weaker regular mail presumption has been overcome. See Matter of M-R-A, 24 I. & N. Dec. 665, 674-75 (2008) (describing multiple factors an immigration judge is to consider).

The Court recognizes that these immigration cases are in a

different posture than this case (i.e. they deal with motions to reopen while this case is a collateral challenge to the 1997 Removal Order). The Court sought the parties' views on whether Diaz-Martinez could demonstrate that he had overcome the presumption of mail delivery and prove (some 20 years later) that he did not receive notice of his immigration hearing. The parties briefing analyzed cases such as the ones above dealing with motions to reopen. Given the apparent paucity of authority on how, in a Section 1326 prosecution, a court is to assess a claim of non-receipt, the Court finds it prudent to follow the general mailbox rule and the mail presumption in motion to reopen cases, set out above.[16]

---

[16] The Court is aware of the so-called "presumption of regularity" and notes that it could have some effect on the analysis of collateral challenge cases like this one. See Parke v. Raley, 506 U.S. 20, 29-30 (1992). This "presumption[,] deeply rooted in our jurisprudence," applies to collateral attacks, and holds that "every act of a court of competent jurisdiction shall be presumed to have been rightly done, till the contrary appears." Id. (quoting Voorhees v. Jackson, 35 U.S. (10 Pet.) 449, 472 (1836)); see also, e.g., Coreas v. Holder, 526 Fed. Appx. 322, 326 (4th Cir. 2013) (unpublished) (per curium); Almy v. Sebelius, 679 F.3d 297, 309 (4th Cir. 2012); United States v. Arevalo-Tavares, 210 F.3d 1198, 1200-01 (10th Cir. 2000); United States v. Arita-Campos, No. 2:05CR48, 2009 WL 306394, *3-4 (N.D. Ind. 2009), aff'd, United States v. Arita-Campos, 607 F.3d 487 (7th Cir. 2010).

The parties have not raised this presumption or made any argument that it applies here. In the absence of the parties' views and arguments on this presumption, the Court will not apply it in this case.

**(b) Application To The Evidence In This Case**

Applying the foregoing framework to the evidence presented in this case, Diaz-Martinez has satisfied his burden to demonstrate that he never received notice of his 1997 immigration hearing. The Court notes that this is a close case, and is based only on the evidence that the Court has before it in this case.

To begin, it is important that the Government did not introduce testimony of the sort that usually animates the presumption. However, the Government introduced both the NTA and the NOH (Gov't Exs. 3 and 4) that were properly addressed to the Heritage Park address. There is no dispute that, at all relevant times during 1997 (when these notices were allegedly mailed), Diaz-Martinez lived with Lemus at the Heritage Park address in Fredericksburg. See, e.g., Hr'g Tr. 28-29; Gov't Ex. 6 (certified mail receipt from October 1997 signed for by Diaz-Martinez at the Heritage Park address). Both the NTA and the NOH have "certificates of service" indicating that they were served by regular mail. See Gov't Ex. 3 (signed by Immigration Officer William Jones); Gov't Ex. 4 (indicating service by mail but the signature is illegible).

And, the Government's witness, Deportation Officer Richard Tine, testified about his general knowledge of how notices (like the NTA and NOH) are served. Hr'g Tr. at 62-68. He first testified

25

to the address that an NTA would be sent to, id. at 63-64, and then (after a question by the Court about whether the certificate of service indicated that the NOH was served "in the usual course of things"), he testified that the certificate of service on the Notice of Hearing "indicated. . .it was mailed." Id. at 67-68. Tine did not testify about the process by which immigration notices were put into envelopes and actually sent in the mail. Nor did he have personal knowledge of the procedures in place in 1997 because he testified that he has been an deportation officer for "[e]ight and a half years." Id. at 49. On cross-examination, Tine also testified that, in other alien files from around the time of Diaz-Martinez's deportation, he had "seen. . .copies of the mail that was sent, and it remains in that alien file." Id. at 114. No such evidence was contained in Diaz-Martinez's file. The Government did not present evidence from immigration officials who were working at the time of Diaz-Martinez's removal proceedings.

While the evidence that the Government mailed the NOA or NOH to Diaz-Martinez is weak, the Court concludes that it is sufficient to raise the presumption of proper delivery and thus receipt by Diaz-Martinez. The following evidence suffices to raise the presumption here: (1) that the correct address for Diaz-Martinez was listed on the NTA and NOH; (2) that the NTA and NOH

26

contained certificates of service indicating service by "regular mail"; and (3) that Officer Tine provided general testimony about the process of serving notices. That is sufficient where, as here, the issue rears its head some twenty-years after the fact. Accordingly, Diaz-Martinez must put forward evidence that he did not receive it.

So the next issue is whether Diaz-Martinez has rebutted the presumption that a regular mail letter is presumed to be delivered and received. Diaz-Martinez's evidence on this point comes from Lemus. Although the best evidence that Diaz-Martinez did not receive notice of his removal hearings is testimony or an affidavit from Diaz-Martinez that he did not receive notice, the evidence in this case is nonetheless sufficient to overcome the presumption of delivery and receipt.

In 1997, Diaz-Martinez was a minor and Lemus was responsible for taking him to his immigration proceedings. Hr'g Tr. at 8, 27-28, 33. Lemus testified that he never received any mail for Diaz-Martinez, either addressed to Diaz-Martinez or addressed to Lemus, informing Diaz-Martinez of his immigration court proceedings. Id. at 28-29, 33, 42, 44-45. Lemus explained how the mail was delivered to Heritage Park: all the mail for the entire apartment complex was delivered to a bank of about 100 mailboxes located at the building entrance. Id. at 29-30. The mail carrier would open

the front panel of the mail box and put mail into the box for individual apartments, like T2, where Diaz-Martinez and Lemus lived. Id. at 30. Lemus testified to issues he had receiving mail on several occasions due to mistakes by the mail carrier in putting mail in the wrong apartment's mailbox. Id. at 30-33. Specifically, Lemus failed to receive Christmas cards on about seven occasions, car insurance paperwork on about five occasions, and Lemus' own legal permanent residence card. Id.

Lemus also testified that he (Lemus) was the only person who had a key to his mailbox, id. at 30-31, and he never gave the mailbox key to anyone else (including Diaz-Martinez) to check the mail for him. Id. at 31, 40. Indeed, Diaz-Martinez and Lemus were the only ones living at the Heritage Park address during the period in question. Id. at 10. In sum, Lemus' testimony establishes that, if he (Lemus) did not receive the notices, no one else would have because no one else had the ability to check the mail for the apartment in which he and Diaz-Martinez lived.[17] And, Lemus testified that he was unaware that Diaz-Martinez had received certified mail informing him that he had been deported.

---

[17]    That finding is not changed by the fact that Diaz-Martinez signed the certified mail receipt for documents informing him that he had already been ordered removed in October 1997. Gov't Ex. 6. That is because such mail necessarily would have been signed for by Diaz-Martinez at the apartment, and would not have passed through Lemus' mailbox. ECF No. 48 at 2 n.1.

Id. at 46.

There is, of course, evidence on the other side. Lemus did receive paperwork in the mail at the Heritage Park address from immigration officials in 1996 when he took responsibility for Diaz-Martinez. Hr'g Tr. at 9, 13, 27-28, 37. And, Lemus had trouble recalling some details about his time at Heritage Park and when he last saw his nephew. Id. 9-10, 29, 31-32, 35, 43-44. Lemus also did not reach out to immigration officials to inquire about the status of his nephew's proceedings. However, on the evidence before the Court, the Court concludes that Diaz-Martinez has put forward enough evidence to rebut the presumption of delivery and receipt of notices of his immigration hearing.

Weighing all the evidence in the record, including the testimony given by Lemus, the Court concludes that Diaz-Martinez did not receive notice of his 1997 immigration hearing. Lemus presented as a credible, law-abiding witness. He entered the United States on a work permit, and testified that he has always maintained legal status (he became a legal permanent resident in 2002). Hr'g Tr. at 4-6. He has been a church pastor, has worked other jobs, and has no criminal convictions. Id. Because Diaz-Martinez was a minor, Lemus was his custodial officer and testified that he would have brought Diaz-Martinez to immigration proceedings had he received notice of when to appear. He testified

29

unequivocally that he did not receive any such notice. And, he was the only one who would have because he had the mailbox key.[18]

It is of some concern that Diaz-Martinez did not offer testimony denying receipt of the NTA and the NOH. In many, if not most, cases, the absence of testimony from the defendant on this point would be fatal to a motion of the sort made by Diaz-Martinez. As discussed previously, several decisions teach that sworn evidence from the defendant can overcome the presumption. However, none of those decisions held that testimony from the defendant was necessary to overcome the presumption. On this record, there is independent evidence that supports Diaz-Martinez's position. And, taking the testimony of Lemus in perspective of the weak evidence presented by the Government to prove that the NTA and NOH were actually mailed, the Court concludes that Diaz-Martinez did not have notice of his removal hearing in 1997. It is now necessary to determine the effect of that finding.

### (2) Diaz Martinez Can Satisfy Section 1326(d)(1), (d)(2) And Show A Due Process Violation

Under El Shami, Diaz-Martinez argues that failure to receive the NTA and the NOH (notice of the removal hearing) excuses him

---

[18]    Lemus testified that, on numerous occasions, he had not received mail that he later learned had been sent to him. That evidence is probative on the issue of whether properly addressed regular mail, on occasion, is not delivered to the addressee.

from exhausting administrative remedies and demonstrating a deprivation of judicial review, thereby satisfying Section 1326(d)(1) and (d)(2). See 434 F.3d at 663-64. Further, he argues that the same evidence and its attendant finding establishes a due process violation, which satisfies the first part of Section 1326(d)(3), the "fundamental unfairness" prong. Id. at 664-65.

As the Government points out, the factual backgrounds of El Shami and this case are different. See ECF No. 47 at 10-11. El Shami testified that he never received notice and the Government conceded that there was no evidence in the record that immigration officials sent him notice as required. See El Shami, 434 F.3d at 663-64. In sum, the defendant in El Shami clearly showed that notice of removal was not provided, whereas here the Government contests that fact.

While there is not uncontradicted evidence in the record that immigration officials failed to send Diaz-Martinez notice of his hearing, Diaz-Martinez has presented enough evidence for the Court to conclude that El Shami applies to this case. It is true that the addresses on the NTA and NOH were correct and there was a certificate of service indicating service by regular mail. See United States v. Ramos-Delcid, No. 3:18-cr-20, 2018 WL 5833081, *6-7 (W.D. Va. Nov. 7, 2018), appeal docketed, No. 18-4860 (4th Cir. Nov. 28, 2018) (immigration notices mailed to incorrect

address). It is also true, however, that the Court has before it weak evidence that the NTA or NOH were actually mailed by immigration officials. That is, there is no testimony from anyone with personal knowledge at the relevant time tending to show how, in the normal course of business, regular mail notices were mailed in 1997. And, the Court has credible testimony from Diaz-Martinez's custodian that the notices were never received. Further, the Court has evidence that, had the notices been received, Lemus would have brought Diaz-Martinez to his immigration hearing.

Accordingly, on the record in this case, the rule in El Shami applies. Because Diaz-Martinez did not have notice of his removal hearing, he did not appear and was thus not properly advised of his rights to administrative and judicial review. See El Shami, 434 F.3d at 664.[19] Therefore, Diaz-Martinez is excused from compliance with Section 1326(d)(1) and (d)(2).

The Court also concludes that, by showing that he did not

_____

[19] The Court also notes that Diaz-Martinez was wrongly informed in the October 1997 letter (Gov't Ex. 6) that "there is no administrative relief which may be extended to you." As both parties acknowledge (ECF No. 44 at 16, ECF No. 47 at 15), that statement was incorrect because Diaz-Martinez could have filed a motion to reopen "at any time" if he could demonstrate that he did not receive notice of his hearing. 8 U.S.C. § 1229a(b)(5)(C)(ii) (1994 & Supp. III 1998). The Court need not decide whether this erroneous information would have separately excused Diaz-Martinez or established a due process violation. See United States v. Arias-Ordonez, 597 F.3d 972 (9th Cir. 2010).

have notice of his removal hearing, Diaz-Martinez has established a due process violation. As El Shami held: "due process requires an alien who faces [removal] be provided (1) notice of the charges against him, (2) a hearing before an executive or administrative tribunal, and (3) a fair opportunity to be heard." 434 F.3d at 665 (quoting United States v. Torres, 383 F.3d 92, 104 (3d Cir. 2004)) (alteration in original). Like El Shami, Diaz-Martinez did know there were "charges against him" from the Show Cause Order. See id. at 665. But, Diaz-Martinez still did not have notice of when his hearing was. Id. That is sufficient, the Court concludes, to establish a due process violation in this case.

Accordingly, Diaz-Martinez has satisfied his burden to show that he is excused from Section 1326(d)(1), (d)(2), and that the 1997 removal proceeding deprived him of due process, thereby satisfying the first requirement of Section 1326(d)(3).

### (3) Diaz Martinez Has Failed To Meet His Burden To Demonstrate Prejudice

Of course, to satisfy Section 1326(d)(3), Diaz-Martinez must show that the due process violation caused him prejudice. To do that, he must establish that, "but for the errors complained of, there was a reasonable probability that he would not have been deported." El Shami, 434 F.3d at 665; Lopez-Collazo, 824 F.3d at 462. "This is not a generalized showing of prejudice; rather, the defendant must link the actual prejudice he claims to have

33

suffered to the specific due process violation at issue." Lopez-Collazo, 824 F.3d at 462.

Diaz-Martinez argues in his briefs that, if he had been informed of the removal hearing, he would have appeared at his immigration hearing and applied for voluntary departure. See ECF No. 18 at 11-12. And, had he applied for voluntary departure, he argues, there is a "reasonable probability" that he would have received it.[20] See ECF No. 44 at 17-19. The Government does not dispute that Diaz-Martinez had no criminal record or prior contact with the immigration system, but argues that "this Court must decide whether the defendant has demonstrated 'a reasonable probability that he would not have been deported.'" ECF No. 47 at 18-19 (quoting El Shami). The evidence does not support such a finding.

Voluntary departure is governed by 8 U.S.C. § 1229c. Officer Tine testified at the evidentiary hearing that there are two types of voluntary departure: one that occurs before the conclusion of the immigration hearing and one that occurs after the conclusion of the hearing. Hr'g Tr. at 116. For pre-conclusion voluntary departure, the alien may "voluntarily. . .depart the United States

---

[20] Voluntary departure is not a prior removal for purposes of 8 U.S.C. § 1326. See United States v. Lopez-Collazo, 824 F.3d 453, 459 (4th Cir. 2016) (citing United States v. Ortiz-Lopez, 385 F.3d 1202, 1204 n.1 (9th Cir. 2004) (per curium)).

at the alien's own expense under this subsection,[21] in lieu of being subject to proceedings under Section 1229a of this title or prior to the completion of such proceedings." 8 U.S.C. § 1229c(a)(1). Officer Tine testified that to qualify for this form of departure, the alien cannot have a felony conviction and must agree to depart within 120 days. Hr'g Tr. at 117; 8 U.S.C. § 1229c(a)(1)-(2).[22] See also In re Arguelles-Campos, 22 I. & N. Dec. 811, 813-17 (BIA 1999); United States v. Ordoñez, 328 F. Supp. 3d 479, 495-97 (D. Md. 2018).

In considering whether to grant voluntary departure, the immigration judge is to consider many factors, including the nature and underlying circumstances of the deportation at issue; other immigration violations by the alien; the alien's criminal record; character of the alien; and the alien's length of time and family ties in the United States. See In re Arguelles-Campos,

---

[21] The BIA has held that the alien's ability to pay is not a proper consideration for determining eligibility for pre-conclusion voluntary departure. In re Arguelles-Campos, 22 I. & N. Dec. at 817.

[22] Post-conclusion voluntary departure requires, inter alia, that the alien "has been physically present in the United States for a period of at least one year immediately preceding the date the notice to appear was served under section 1229(a) of this title." § 1229c(b)(1)(A). Because the evidence in this case establishes that Diaz-Martinez entered the United States "on or about" August 17, 1996, see, e.g. Gov't Ex. 1, and the NTA is dated June 18, 1997, see, e.g., Gov't Ex. 3, Diaz-Martinez was not present for "a period of at least one year," and thus would not qualify for this form of relief.

22 I. & N. Dec. at 817; <u>Matter of Gamboa</u>, 14 I. & N. Dec. 244,
248 (BIA 1972); <u>United States v. Ramos-Ramirez</u>, 128 F. Supp. 3d
896, 902 (D. Md. 2015) (voluntary departure determination requires
"balancing of positive and negative equities"). The immigration
judge has discretion to grant voluntary departure. See <u>In re
Arguelles-Campos</u>, 22 I. & N. Dec. at 817.

In <u>El Shami</u>, the Fourth Circuit held that there was a
"reasonable probability" that El Shami would have been granted
relief from deportation[23] despite having "two serious felony
convictions on his record," because "there is substantial
mitigating evidence in the record," including that El Shami had
been present in the United States for 13 years, that his wife and
son were citizens who relied on him for financial assistance, and
that he paid federal income taxes on his business. 434 F.3d at
665.

The record in this case does not permit the Court to conclude
that Diaz-Martinez would have applied for and been granted pre-
conclusion voluntary departure. First, Diaz-Martinez's assertion
that he would have applied for voluntary departure comes through
his brief, not through any evidence in the record. Diaz-Martinez

---

[23] <u>El Shami</u> did not involve voluntary departure, but the form
of discretionary relief required the immigration judge to weigh
virtually the same factors as in a voluntary departure request.
434 F.3d at 665.

did not testify or put forward an affidavit that he would have applied for voluntary departure (nor did Lemus mention this in his testimony). In a Section 1326 prosecution, it is the alien's burden to demonstrate that he satisfies all three requirements of Section 1326(d). The Court cannot rely on the argument of counsel rather than evidence in the record.

Second, there is evidence in the record that Diaz-Martinez did not have a felony on his record, Hr'g Tr. at 118, that his uncle lived in the United States (Lemus), and that he had not had prior encounters with immigration officials. However, the record is also clear that Diaz-Martinez had been in the United States for less than one year and the Court has no evidence of other family Diaz-Martinez had in the United States (other than Lemus). See United States v. Itehua, No. 3:17-cr-119, 2018 WL 1470250, *3-4 (E.D. Va. Mar. 26, 2018) (post-conclusion voluntary departure could have been granted where alien had lived and worked in United States for more than 10 years, had a U.S. citizen child, and had limited criminal history); Ordoñez, 328 F. Supp. 3d at 486, 496-97 (pre-conclusion voluntary departure appropriate where alien was present for 10 years prior to his application for voluntary departure and his parents lived in United States); In re Arguelles-Campos, 22 I. & N. Dec. at 817 (noting that "long residence [in the United States], close family ties in the United

States, or humanitarian needs" may warrant the immigration judge's favorable exercise of discretion). The fact that Diaz-Martinez had been in the United States for a short period of time and that there were minimal family ties (on the record before the Court) would have cut against an immigration judge granting voluntary departure. Nor, is there any evidence of "humanitarian needs." In re Arguelles-Campos, 22 I. & N. Dec. at 817.

Further, Diaz-Martinez was a minor in 1997. While the parties agree that this fact would not have prevented Diaz-Martinez from receiving voluntary departure, the Court has no evidence that Diaz-Martinez would have been willing and able to voluntarily depart. Though the BIA has said that the alien need not establish that he has "the financial means to depart the United States" to qualify for pre-conclusion voluntary departure, In re Arguelles-Campos, 22 I. & N. Dec. at 817, this Court needs evidence that the alien would have applied for such relief and could have actually departed on his own. This is especially true where the alien is a minor. No such evidence exists on this record.[24]

_____

[24]    The Court also notes that evidence in the record suggests that Diaz-Martinez may not even have showed up at his removal proceedings had he known about them. For example, after he was arrested in 1999 and had the 1997 Removal Order reinstated, Diaz-Martinez was informed that he would be deported on November 1, 1999 (pursuant to the 1997 Removal Order). Hr'g Tr. at 78. Diaz-Martinez did not show up to be removed on November 1, 1999. Id. 78-79. While this evidence is not necessary for the Court's resolution of the prejudice inquiry, it illustrates the need for

In sum, to establish a "reasonable probability" that he would have applied for and received voluntary departure, Diaz-Martinez must put forward evidence, not argument of counsel, that allows the Court to assess his claim. The evidence the Court does have does not establish a "reasonable probability" that he would have been granted voluntary departure. In the absence of such evidence (as here), his prejudice claim must fail.

### (4) Section 1326(d) Conclusion

For the reasons set forth above, Diaz-Martinez has not demonstrated that the due process violation actually prejudiced him. Thus, he fails to satisfy Section 1326(d)(3). Accordingly, the Motion must be denied.

### B. Jurisdiction Of The Immigration Court

Diaz-Martinez's second argument is that the immigration court lacked jurisdiction to hear his case in 1997; and therefore, that the removal order was invalid. See, e.g., ECF No. 18 at 12-19; ECF No. 20 at 1-8. The argument proceeds as follows: (1) the immigration court is vested with jurisdiction by the filing of a charging document; (2) one such charging document is an NTA; (3) in Pereira v. Sessions, 138 S. Ct. 2105 (2018), the Supreme Court held that an NTA must designate the time and place of the alien's

---

evidence to support the argument that Diaz-Martinez would have appeared and sought pre-conclusion voluntary departure.

immigration hearing to be valid; (4) the NTA in this case did not designate the time and place of Diaz-Martinez's immigration hearing; and (5) because the NTA was invalid, jurisdiction never vested in the immigration court. See ECF No. 18 at 12-14; ECF No. 34 at 13-17. Thus, says Diaz-Martinez, the hearing officer lacked subject matter jurisdiction and the 1997 Removal Order cannot serve as the predicate removal for a prosecution under 8 U.S.C. § 1326. See ECF No. 18 at 16. The Government argues that Pereira dealt with a different question and has no application here; that jurisdiction of the immigration courts is governed by regulations, which were complied with here; and that any defects in the NTA were cured by the subsequent NOH. ECF No. 19 at 18-28; ECF No. 37 at 12-15.

While a few District Courts have agreed with Diaz-Martinez's argument about the impact of Pereira on the jurisdiction of the immigration court,[25] that is a clear minority position. As far as the Court is aware, every District Court in this Circuit to have considered a jurisdictional attack based on Pereira has rejected

---

[25] See, e.g., United States v. Tzul, 345 F. Supp. 3d. 785 (S.D. Tex. 2018); United States v. Ortiz, 347 F. Supp. 3d 402 (D.N.D. 2018); United States v. Valladares, 2018 WL 6629653 (W.D. Tex. Oct. 30, 2018); United States v. Virgen-Ponce, 320 F. Supp. 3d 1164 (E.D. Wash. 2018); see also Kit Johnson, Pereira v. Sessions: A Jurisdictional Surprise for Immigration Courts, 3 Colum. Hum. Rts. L. Rev. Online 1 (2018).

it.[26] And, unpublished, non-binding Fourth Circuit authority supports the logic of that view. See Leonard v. Whitaker, 746 Fed. Appx 269 (4th Cir. 2018) (unpublished) (per curium); United States v. Perez-Arellano, No. 18-4301, 2018 WL 6617703, at *2-3 (4th Cir. Dec. 17, 2018) (unpublished) (per curium). At least three Courts of Appeals have rejected similar jurisdictional attacks in published opinions, and no Circuit Court decision to the contrary has been cited by Diaz-Martinez. See Banegas Gomez v. Barr, __ F.3d __, 2019 WL 1768914 (2d Cir. 2019); Karingithi v. Whitaker, 913 F.3d 1158 (9th Cir. 2019); Hernandez-Perez v. Whitaker, 911 F.3d 305 (6th Cir. 2018). In other words, the clear weight of authority is against Diaz-Martinez's position.

The Court agrees with the well-reasoned analysis in Gomez-Salinas that regulations, not the statutory provisions at issue in Pereira, govern the vesting of jurisdiction in the immigration courts. 2019 WL 1141063 at *4. First, "the statute governing

---

[26] See, e.g., United States v. Flores, No.3:18-cr-152-JAG, 2019 WL 1756532 (E.D. Va. April 19, 2019); United States v. Cruz Bonilla, No.3:18-cr-150-JAG, 2019 WL 1756533 (E.D. Va. April 19, 2019); United States v. Gomez-Salinas, No. 2:19cr10, 2019 WL 1141063 (E.D. Va. Mar. 12, 2019); United States v. Hernandez-Aguilar, No. 5:18-CR-137-FL-1, 2019 WL 456172 (E.D.N.C. Feb. 5, 2019); United States v. Vasquez Flores, 362 F. Supp. 3d 349 (W.D. Va. 2019); United States v. Rivera Lopez, 355 F. Supp. 3d 428 (E.D. Va. 2018); United States v. Romero-Caceres, No. 1:18-cr-354, 2018 WL 6059381 (E.D. Va. Nov. 19, 2018); United States v. Ramirez, No. 3:18-cr-00026, 2018 WL 6037540 (W.D. Va. Nov. 16, 2018).

removal proceedings is silent as to the jurisdiction of the immigration court." Id.; 8 U.S.C. § 1229; see also Karingithi, 913 F.3d at 1160 ("Section 1229 says nothing about the Immigration Court's jurisdiction.").

Second, because the statue is silent on jurisdiction, the Attorney General has promulgated a regulation providing that "[j]urisdiction vests, and proceedings before an Immigration Judge commence, when a charging document is filed with the Immigration Court by the Service."[27] 8 C.F.R. § 1003.14(a); Gomez Salinas, 2019 WL 1141063 at *4. Under a separate regulation, 8 C.F.R. § 1003.13, an NTA is defined as a "charging document."

Chief Judge Davis succinctly described the requirements of the regulatory NTA and the differences between the statute and the regulations:

> Both the statute and the regulation list requirements for the contents of a Notice to Appear. The regulation requires a Notice to Appear to include specified information, such as "[t]he nature of the proceedings," "[t]he acts or conduct alleged to be in violation of law," and "[n]otice that the alien may be represented, at no cost to the government, by

---

[27] In Shogunle v. Holder, the Fourth Circuit indicated that the NTA had to be filed with the immigration court before jurisdiction would vest. 336 Fed. Appx. 322, 324-25 (4th Cir. 2009) (unpublished) (per curium). Diaz-Martinez does not argue that the NTA was not filed with the immigration court; rather, he argues that the NTA was defective. The Court does not find Shogunle to apply here because the "charging document" was filed with the immigration court. See Vasquez Flores, 362 F. Supp. 3d at 355 (rejecting similar argument based on Shogunle).

> counsel or other representative." 8 C.F.R. §
> 1003.15 (b). The regulation does not mandate
> that the time and date of proceedings appear
> in the initial notice; the time and date only
> need to be included "where practicable." 8
> C.F.R. § 1003.18(b). If "that information is
> not contained in the Notice to Appear," the
> regulation permits "scheduling the initial
> removal hearing and providing notice to the
> government and the alien of the time, place,
> and date of hearing" subsequently. Id. The
> statute contains largely the same
> requirements as the regulation, except it
> demands inclusion of "[t]he time and place at
> which the proceedings will be held." 8 U.S.C.
> § 1229(a)(1)(G)(i).

Gomez-Salinas, 2019 WL 1141063 at *4. Accordingly, the fact that the 1997 NTA in the record (Gov't Ex. 3) did not contain the date and time of Diaz-Martinez's hearing is not dispositive in this case because the regulatory definition did not require that. Diaz-Martinez does not argue that the NTA was not filed with the immigration court, as required by the regulation.

Pereira v. Sessions, 138 S. Ct. 2105 (2018) does not change this analysis. In Pereira, the Supreme Court dealt with a "narrow question" that "lies at the intersection of [two] statutory provisions." 138 S. Ct. at 2110. That question was whether a "notice to appear" that "fails to specify either the time or place of the removal proceedings. . .trigger[s] the stop-time rule[.]"[28]

---

[28] 8 U.S.C. § 1229b(b)(1) permits the Attorney General to "cancel removal of" certain aliens if, among other requirements, the alien "has been physically present in the United States for a continuous period of not less than 10 years immediately preceding

Id. Because the "stop-time rule" explicitly cross references a "notice to appear under section 1229(a) of this title," the Supreme Court looked to that statutory section. Id.; see also id. at 2114. That section, 8 U.S.C. § 1229(a), requires, inter alia, that a notice to appear "specify[]. . .(G)(i) The time and place at which the proceedings will be held." Id. at 2110. Finding that the "statutory text alone [was] enough to resolve [the] case," id. at 2114, the Supreme Court held that "[a] putative notice to appear that fails to designate the specific time or place of the noncitizen's removal proceedings is not a 'notice to appear under section 1229(a),' and so does not trigger the stop-time rule." Id. at 2113-14.

This "narrow" holding does not address the jurisdiction of the immigration court, which, as discussed above, is established by regulations. See 8 C.F.R. §§ 1003.13-1003.15, § 1003.18; Gomez-Salinas, 2019 WL 1141063 at *4. As the Ninth Circuit recently held, "[t]he regulations, not § 1229(a), define when jurisdiction

_____

the date of such application." § 1229b(b)(1)(A).

The "stop-time rule" states that "any period of continuous residence or continuous physical presence in the United States shall be deemed to end. . .when the alien is served a notice to appear under section 1229(a) of this title. . . ." 8 § 1229b(d)(1) (emphasis added). In other words, the statutory provision establishing the "stop-time rule" expressly incorporates the statutory definition of "notice to appear" found in 8 U.S.C. § 1229(a).

44

vests. Section 1229 says nothing about the Immigration Court's jurisdiction. And for their part, the regulations make no reference to § 1229(a)'s definition of a 'notice to appear.'" Karingithi, 913 F.3d at 1160; see also id. at 1161 (discussing how Pereira's analysis "hinge[d] on 'the intersection' of two statutory provisions"); Gomez-Salinas, 2019 WL 1141063 at *5 (quoting Karingithi); Banegas Gomez, 2019 WL 1768914 at *6-8. As the Court in Karingithi so aptly put it, the Supreme Court's "resolution [in Pereira] of that [narrow question at issue] cannot be recast into the broad jurisdictional rule Karingithi advocates." Karingithi, 913 F.3d at 1161; see also Matter of Bermudez-Cota, 27 I. & N. Dec. 441, 443 (BIA 2018) (noting that, had the Supreme Court intended such a far-reaching jurisdictional ruling in Pereira, it likely would not have referred to its holding as "narrow").

The Fourth Circuit's unpublished opinions confirm a narrow holding of Pereira. See Leonard, 746 Fed. Appx. at 269 ("We conclude that the narrow holding of Pereira does not apply in this situation."); Perez-Arellano, 2018 WL 6617703, at *3 ("Simply put, Pereira did not address the question of an immigration judge's jurisdiction to rule on an alien's removability, and it certainly does not plainly undermine the jurisdiction of the 2004 removal proceeding.") (footnote omitted). These authorities persuasively

establish that Pereira did not void Diaz-Martinez's 1997 removal proceedings, and the Court follows them.

The Court recognizes that many of the cases cited above approve of the so-called "two-step notice process" by which service of a subsequent NOH can cure any alleged defects in the NTA. See, e.g., Gomez-Salinas, 2019 WL 1141063 at *5; Banegas Gomez, 2019 WL 1768914 at *7; Hernandez-Perez, 911 F.3d at 313; Karingithi, 913 F.3d at 1161-62; Matter of Bermudez-Cota, 27 I. & N. Dec. at 447. As the Court concluded above, Diaz-Martinez did not receive a NOH. That does not change the outcome here.

Even if Diaz-Martinez did not receive the NOH (or if the NTA is defective under Pereira), Diaz-Martinez's argument fails because the immigration regulations do not impose a subject matter jurisdiction limitation such that the removal order is ultra vires. As Judge Brinkema's sound analysis in Rivera Lopez clearly explains, "section 1003.14 does not impose a subject-matter jurisdictional limitation" on immigration courts. 355 F. Supp. 3d at 439; Flores, 2019 WL 1756532 at *3-4 (following Rivera Lopez); Vasquez Flores, 362 F. Supp. 3d at 355-56 (same). "'Jurisdiction' is a term that can convey 'many, too many, meanings.'" 355 F. Supp. 3d at 439 (quoting Union Pac. R.R. Co. v. Bhd. of Locomotive Eng'rs & Trainmen, 558 U.S. 67, 81 (2009)). Rather than a subject matter jurisdiction limitation, Rivera Lopez analyzed Section

46

analyzed Section 1003.14 as follows:

> In that sense, section 1003.14(a) is more akin
> to a federal court's local rules, which (like
> the regulations at issue here) are the product
> of congressionally delegated gap-filling
> authority, see Fed. R. Civ. P. 83(a)(1), but
> which in no way affect the federal court's
> subject-matter jurisdiction. Accordingly, the
> best reading of section 1003.14(a) is that
> although it imposes a procedural requirement
> on immigration authorities' initiation of
> removal proceedings, that requirement is not
> "jurisdictional" in the formal sense, and a
> defect in a notice to appear does not
> necessarily render a resulting deportation
> order void ab initio.

Rivera Lopez, 355 F. Supp. 3d at 439. Several other courts in this Circuit have hewed to this reasoning. See Flores, 2019 WL 1756532 at *3-4; Cruz Bonilla, 2019 WL 1756533 at *3-4; Vasquez Flores, 362 F. Supp. 3d at 355-56. And, because the reasoning is both sound and correct, it will be applied here. Thus, the Court concludes that Diaz-Martinez has not established that his 1997 Removal Order is ultra vires or void for lack of subject matter jurisdiction.

**CONCLUSION**

For the foregoing reasons, Defendant's MOTION TO DISMISS INDICTMENT (ECF No. 18) is denied.

It is so ORDERED.

                     /s/      _REP_
                     Robert E. Payne
                     Senior United States District Judge

Richmond, Virginia
Date: May _1_, 2019